Good morning. I'll let you come up. I'll let you know if you need time for rebuttal and how much, and you may call the first case. Case number 126175, shelter 287, and 126234, United States of America v. Kody Evans and Tommie Dunn. Oral argument is 10 minutes for Ethan Pallett and 20 minutes for Apolli, Mr. Wolf, with the appellant. I reserve two minutes. My name is Scotty Wilkes. I represent the appellant in this case of Kody Evans. Mr. Evans is here today to represent this court to reverse the lower court decision denying his motion to suppress and dismiss this case from the Western District of Tennessee and Memphis, Tennessee. The appellant is going to present two issues that I'm arguing today for the appellant. The first is that when the officers entered the apartment on November 12, 2008, in Memphis, Tennessee, where Mr. Kody Evans was residing, they violated his Fourth Amendment rights. We're going to submit to the court that the officers lacked probable cause in essence of the circumstances to enter the apartment without a warrant. I submit to the court that this court and the U.S. Supreme Court has previously held that, extensive circumstances and situations where real, immediate, and serious consequences will certainly occur if the officers don't postpone their actions in order to obtain a warrant. And I will submit to the court that there's no facts in this case that would arise to the level of where the officers could have said that there's extensive circumstances to enter the apartment. Mr. Wilkes, what remedy do you seek for the alleged Fourth Amendment violation? Your Honor, I'm asking the court to dismiss the criminal charges against Mr. Kody Evans. It's our position, which is our second argument, even if they arise to the level of an extensive circumstance, that the officers, when they entered the apartment, didn't have probable cause to arrest Mr. Kody Evans. So I'm asking the court to dismiss the case. Well, they wouldn't have probable cause without the search? Is that the argument? Sir? They would not have probable cause were it not for the search that occurred after they entered? My submission is they didn't have probable cause because as the officer testified in the suppression hearing, from the first robbery all the way up to the last robbery all the way up to the point of entering the apartment, kicking the door in, they knew nothing about my client. After they did the search, they certainly knew about your client, didn't they? Yes. Okay, so after the search, they had probable cause, right? I'll submit they still didn't have it. According to the officer's testimony, the only thing they had, they knew nothing about his name, knew nothing about him, the only thing they had was a general description. And in so many ways... How about the fact that he seemed to be the one holding the door closed and then he ran when he saw his police? Well, Your Honor, I submit to the court that they didn't know that he was the one who held the door open until the following day. Okay, well they knew he ran. They knew he ran, correct. What do you think of that? Your Honor, I still say that that doesn't allow us to say that he was guilty of any criminal offense at the time. I'll submit to the court that... Well, you don't have to be guilty, there just has to be probable cause. I mean, I agree with you that it just had to have probable cause, but I submit to the court that there is nothing to say that he committed any crimes or any crimes was in the process of being committed at the time. But I guess maybe a part of your point is they wouldn't have been able to get that information of probable cause had they not entered the apartment, so that takes you back to the exigent circumstances. So on that front, they're told that there's a baby in there. They have a reason to think there might be weapons in the people and they might be dangerous, maybe not including your client, but that could be true of the people there. So they go up, they try to get in, and what do you do about the fact that there was a hearing, the district court got to see it, and the way the district court was looking at it was there was scratching noises and someone said, don't open the door, and that led them to think it was a barricade situation. So what's wrong with that way of thinking about the case? Your Honor, respectfully, I will say that the officer tested his credibility, and this will be an issue to me. One of the things he did. That hurts you. I mean, if the district court, we have to look at all this evidence in a way that favors the government, because the government won on this issue after a hearing where the district court would have had a chance to size up the credibility of the witnesses. I understand, Your Honor, but one of the things that hurts, I think, that hurts the government case is that the officer testified that he heard what would sound like moving of furniture, but upon entering the apartment, he also testified that there was nothing, the apartment was not out of order or anything, that it did not appear that there was any kind of situation where furniture was trying to move behind the door or any kind of barricade situation. Isn't the way we look at this what they were thinking before they got in the apartment? I mean, would you lose this case had there actually been furniture moved? No, I still submit that I don't. That's just one of the factors that I will argue to support the fact that there was no essential circumstance. One of the key factors in this case, the fact that there was no existential circumstance, is that they used Ms. Lakeisha Thomas' position that she had an 11-month-old child in the apartment. This is a lady that just walked out of the apartment on her own free will. If the officer had not approached her or stopped her, I'm almost certain that she would have went back on her own free will. She was not afraid of anybody in the apartment. The testimony from the officer was that she became very frightful when they started questioning her about who was in the apartment, about the two people they were looking for. They knew nothing about Cody Evans at the time. She became very frightful when they were questioning her, and she wanted her baby out of there before they'd do anything. She was afraid of the situation that they was getting ready to create, not of the situation of the people that was inside the apartment. I submit that they used that as a reason to try to get into the apartment without a warrant. In addition to the fact that they did not have any facts besides Ms. Lakeisha Thomas, as I stated earlier, the officer testified that the furniture was not in a situation where it was a barricade situation. Also, there was no harm or threat. Ms. Lakeisha Thomas told the officer and Mr. Detective Bartlett testified that according to Ms. Thomas, she believed that there was a weapon in the house. She did not know. There was no threat, harm, or anything to anyone within that apartment complex or in that apartment complex. The 11-month-old child was the child of my client, Cody Evans. I submit to the court that there's no facts in this case that would arise from the level of saying that there's probable cause or circumstances to even go in there without a warrant. They had an opportunity to go get a search warrant, I mean get arrest warrants. They went to the apartment for the sole purpose of getting facts to support arrest warrants. But they abandoned that on the grounds of some essential circumstances. And the last argument was, Your Honor, I submit that it was dealing with the probable cause. As I said, from the start and the suppression here from the start to the finish, from the first robbery all the way up to the last, the point of kicking the door in, they knew nothing about Mr. Evans. Mr. Evans, once they came in, they came in with the guns drawn, he was down on the floor, officer's testimony. He was not free to leave at that time on his own free will. He was arrested. What about the inevitable discovery doctrine? Weren't things going to be pretty grim for him once they went into the apartment? Your Honor, I'll submit that's a possibility that could arise, but I'll submit to the court, because they arrested him illegally, because they had no identification from him from either of the victims, the arrest, it arrives to the level that it should be dismissed because they can come bring the charges back probably, but the case should be dismissed because they didn't have the probable cause to arrest him. All right. I see that you're ready by this time. Good morning, Your Honors. I'm Ned Germany, appearing for Ms. Holt. First, Your Honors, I would like to thank you for appointing Ms. Holt. We're really enjoying her, and she's been a great defender, and on behalf of her, she'd like to thank you as well, and her apologies for not being able to appear today. Your Honors, I do want to reserve two minutes for rebuttal. In this case, it's our position that Mr. Dern, he was in a home where he had the authority to be there, and he had an expectation of privacy to be there. That home was entered. It was actually an apartment. The apartment was entered without a warrant, and it's our position that the evidence that was obtained inside the house should be suppressed. Well, wasn't the search inside the house conducted pursuant to a consent search? I'm sorry. Wasn't the search that was conducted inside the home done pursuant to consent by Kirby? Correct, Your Honor. So if the search is the product of a consent search, what does it make any difference how the police got into the house? Well, I think when you have a situation where you have someone who's in an apartment, who has a reasonable expectation of privacy in that apartment, which really is what the district court held and the magistrate judge held, it's a situation where someone's in their home, and a door gets kicked in, and Mr. Dern had every right to object to the officer's entry into the home, but at that point, the entry had already been made. They had already kicked in a door. They had already run through the house with several officers. At that point, can Mr. Dern really be expected to object and say, hey, you don't have a warrant when they're coming in with guns drawn and running through the house with multiple officers? The district court did hold that Mr. Dern had an expectation of privacy in the home, but of course the consent was done by Ms. Jones, who was taken outside the home, outside the presence of Mr. Dern, and she was asked for consent. And sure, she did give consent, but the officer called it. The search was conducted pursuant to the consent, was it not? It wasn't a warrantless search. It was a search by consent, was it not? Well, it's our position that... No, is that correct or not? Well, I would disagree with Your Honor in saying that this search was done without a warrant, because in fact what had been done is the officers had... Well, it was done without a warrant, but the U.S. Attorney says it was done by consent. And I apologize, I meant to say consent. They did come in initially without consent. You're correct in the sense that... I can see the plaintiffs having an excessive force, a 1983 claim, for the door being broken down and maybe their trauma of the illegal entry, but it's something else to say that that initial 1983 claim leads to the suppression of the evidence, which was really uncovered pursuant to a consent. It's our position that the consent was not valid in this case. That's a different issue, though. Now you're saying that the other tenants needed to consent for it. Well, there are a couple of reasons I believe that the consent was not valid in this case. Obviously, Ms. Jones can consent under the apparent authority, but the officers also had reason to believe that Mr. Dunn had an expectation of privacy. So when you take Ms. Jones outside of the presence of Mr. Dunn and ask her privately if they can go in and get consent, it's our position that that was done for the purpose of getting someone out of the house and basically not giving Mr. Dunn the opportunity to object. Is there any law that says you have to give co-defendants an opportunity to object? I mean, there is authority that when a co-defendant objects to a search, it may not be conducted based upon the other tenant's consent. But I know of no authority that says that the police have a duty under the law to provide an opportunity of all the co-defendants to object. If there is some authority, I guess I'd like to know about it. I agree with you, Your Honor. The closest we can come is Georgia v. Randolph. As Your Honor knows, that's the case where the co-tenant objected and they asked the other co-tenant, I believe it was their wife, she consented and they went in anyway. Now, in this case, Mr. Dunn did not object. Well, that's right there is the point. They did provide an opportunity, the opportunity being the police were there. If you don't like what's happening, say something. Providing an opportunity doesn't mean saying, Are you okay with this at every turn? I agree with you, Your Honor. But I hear what you're saying, but I disagree with you, Your Honor, in the sense that when police come and kick in the door, and it's pretty much over at that point. I mean, for Mr. Dunn to say, Hey, I object, you need a warrant.  They're already in the house. They didn't seem to have a problem with trying to keep the door closed. You're making it sound like milquetoast, we're afraid of authority. That wasn't exactly the facts of this case. They don't have a duty to open up that door. No, no, I agree with you. I'm just making the point that we're pretty aggressive in trying to keep the police out. Why is it too much to say, you know, officers, you have no right to be here. Because the door had been kicked in, and once the door is kicked in, I think all bets are off. I think that to expect Mr. Dunn to object once the door had been kicked in and multiple officers come rushing in, I don't think it's reasonable for him, for Your Honor, to say, Well, he should have objected. He should have said, You can't come in and search when, in fact, they had already been all throughout the house. But that's our position on the George v. Randolph issue, is I think once the entrance was made, Mr. Dunn had a reasonable expectation of privacy to object. The consent by Ms. Jones, it wasn't. Our position is that it didn't carry the day. It didn't been initiated by the fact that he didn't object. As far as the exigent circumstances that Mr. Arvin has cited in this case, first, I will submit that as far as the stop and the seizure of Ms. Thompson outside and the information that they gained, I think that we all know that these officers can approach people out on the street and ask them questions. Would you even have standing to challenge it? That's the other problem, Your Honor. Even if it wasn't an illegal search or an illegal seizure of the people outside, I think we're going to have a difficult time arguing that because their rights were violated, somehow it carries over to the things in the home. So I would agree with Mr. Arvin when he said in the brief about the exigent circumstances, well, with regard to the illegal seizure that occurred outside the home. But I will say this, once the interview has taken place, I think the exigency was created by the officers and what they told Ms. Thompson outside, basically saying, we're going in. And then at that point she says, well, I want to get my child in. They didn't have to go in without getting a warrant first. And the fact that they didn't get a warrant first, it didn't improve the situation of the child. If they went in at that time, the child was in danger. If they waited 30 minutes to get a warrant, it's the same danger. Is it possible, I mean, I get what you're saying, that they may not have helped when it came to the safety of the child. But what about the possibility that the girlfriend now knew what was up and the risk that if they'd gone to get a warrant, the girlfriend would have said, hey, you might not want to stay there. She could have been detained outside the home, that's our position. There was no need to let her run back in. And she was obviously leaving, leaving for some period of time. And so why could they detain her? On what ground could they detain her and seize her? Pardon me? On what ground could they seize her? You're saying they could have kept her outside, in other words, restricted her movement while they got the warrant. I'm asking you, on what ground could they detain her? Is she guilty of anything? I believe that they could have detained her for questioning in relationships. She was answering questions with regard to people inside the home. But that was a consensual encounter. She wasn't suspected of anything. I do think that they could have detained her for… You're agreeing with my saying something the opposite of what you're saying. I don't know what you mean by that. I think they could have detained her for one purpose and one purpose only, to keep her from going back into the house and alerting those… But that's a seizure. You can't just seize people. You have to have… I don't understand what the theory is. There's no suspicion she did anything wrong. It's a consensual encounter. If she wants to leave, she gets to leave. I believe the officers could have… I think that there would have been some kind of way that they could have held her. There's some type of circumstances that they could have held her. That's our position. But I do understand Your Honor's concern with that. I'm out of time. Thank you. All right. Thank you. Your Honors, I am Tony Yarbrough from the U.S. Attorney's Office in Memphis. On behalf of the United States, Your Honors, I'd ask the Court to affirm the District Court's order denying the defendants' motions to suppress evidence in this case. First, I would submit to the Court that the District Court and the Magistrate Judge properly found in this case that there were exigent circumstances for the officers to enter the apartment where the defendants were arrested. On the exigent circumstances, so the officers, they go up there, maybe they're concerned about the baby, maybe… God knows what they were thinking. But let's just say the people in the apartment when they arrived had either spoken to the door, not opened the door, said, listen, you know, very politely, no movement of anything. They just said, we don't want to talk to you right now. We're in the middle of something. That's that. Would the officers have had a right to barge in without a warrant? Obviously, it would not be nearly as strong a case, but… You'd have to go back to… What's your answer? I would say no. They wouldn't have a right. I would say no. It's a consensual encounter at that point, and they're allowed to be in their home, and if it's a consensual encounter, the whole point is it's consent. If you don't want to talk, you don't have to talk. Right.  So that's just an impolite way of doing the exact same thing, and I don't think the Fourth Amendment turns on whether you're polite or the language you use. So why does that statement… Why isn't that statement just another way of saying we don't consent to talk to you right now? I guess because those are not the facts. You have to look at the totality of the facts at the instant they entered. Wait, wait. Was that one of the facts that the district court relied on? That they were… Someone said inside the apartment don't open the door. Yes, it was. So I'm telling you that fact seems irrelevant. Before you go to totality, I want to… Don't you think that fact's irrelevant? Because that's just an impolite way of saying we don't want to talk. I think it's irrelevant if it's considered in isolation, just that they went and knocked on the door and we said we don't want to talk, which, of course, people can do. But when you look at the facts here that there have been a series of armed robberies, that the officers knew that two known of the robberies were in there and the known robbers and innocent people have the exact same right when it comes to consensual encounters. They're in the exact same position. They do, but you have to look at the totality of the circumstances up at the very point, at the point they entered. I think you have one more circumstance and it's the scratching on the floor. I think the scratching on the floor, hearing the running, you know, the… Running? The officer testified he could hear scratching on the floor, making him think there was a barricade situation. He testified that he could hear running. He testified he could hear a voice saying don't open the door, which would suggest that somebody was telling somebody else not to open the door, which would buttress his thought that this was a barricade situation. When you go back to the total facts in this case and think about the total facts, Your Honors, there have been a series of violent armed robberies. So the statement don't open the door wasn't directed to the police, but it was directed to somebody inside? Right. That's the inference. Why is that problematic? I don't understand how it makes a difference whether one person directly says to the police don't open the door or another person in the house says now is not the time to talk to the police. Don't open the door. I think you've got the totality of the circumstances making the officer think that… First, they knew there was an 11-month-old baby in there. They knew that Mrs. LaKindria Thompson, the lady out in the parking lot, had said basically Mr. Dunn and Ms. Jones are up there. If they were really concerned about the baby, do you think it was a great idea to encounter these guys? Well, they had to encounter them at some point. What were they going to do? It was likely they thought that the people in the apartment had seen them out in the parking lot. There was direct vision from the apartment number four down in the parking lot. They had to do something. That's the part of this that just drives me crazy. You can't have it both ways. You get consensual encounters, but if your consensual encounter is going to alert the occupants you're there, you can't suddenly say, ah, they knew we were here. We had to do something. That was the police officer's fault. Isn't that Kentucky v. King, though? Exactly. Which relies on a Sixth Circuit case, and both cases say the same thing. If you take the gamble as an officer of not getting a warrant, opting to do a consensual encounter, and the police and the occupants learn you're there, you can't say they now know we're here and use that alone as anything. That doesn't mean anything. All that matters is if the occupants do something suggesting they're going to hurt somebody, suggesting they're going to destroy evidence, and I agree, a barricade situation would probably work. The question is whether there was evidence of a barricade situation. Of course, Kentucky v. King aggregated the Sixth Circuit case and I think, I mean, even if you only look at the facts that happened after they knocked on the door and hear the shuffling, hear the running, they said they heard running, it's in the transcript, but he basically heard shuffling making him think there was a barricade situation. I mean, it was reasonable for the officers. They were legally entitled to go up there and knock on the door under Kentucky v. King. Once they heard the running, the barricading sounds, they certainly could think there was a possibility that evidence was being destroyed. I mean, they saw the card from one of the victims out in the car. It's something that could be flushed down the toilet. So there were facts. Where was the thing, the card? Right, when the officers came into the parking lot and saw Ms. LaKindria Thompson and Albert Nelson out by the car matching the description of the getaway car that was used in the robberies, when the officer was talking to Ms. LaKindria Thompson, he looked down into the passenger bottom part of the door and saw a card in the name of a man named Rajiv Shamar. Rajiv Shamar had been robbed a week earlier and they had his Costco card. So they knew that there were some more Costco cards with other people's names on them in the apartment. Absolutely, because in each of these robberies they took personal items, including wallets and purses. Isn't that a testimony theory? It is. That they were flushing these cards down the toilet. No, it is part of the testimony that they took personal items from the victims during the robberies. I'm just asking, their theory that there was an exigent circumstance, did they testify, we had to barge in because we were afraid they were going to destroy this evidence? No, they didn't. I think the primary reason for going in was the danger to the 11-month-old baby and others and to them affecting them and the rest. But I think it's an alternative basis that the evidence was being destroyed. I think Kentucky v. King and some of the cases of this court say you can have an alternative theory. You don't have to look at the subjective intent of the officers going in. You look to the objective facts. And I would point out, too, even if we lose on the exigent circumstances, which I submit we should not, even if we lose, I think the consent prevails. Even if they were illegally entered, which we submit they did not, after they allegedly illegally entered, which we're not conceding in any way and submit they didn't, they still got consent. They got valid consent from Ms. Kirby Evans. And she signed a written consent form under the Sixth Circuit cases of Calhoun and the Sixth Circuit cases of Murray. That's an independent source. So even if we lose on the exigent circumstances, which I don't want to concede, and you've gotten me... Just asking questions. I know, I know. That's what y'all do. I've learned this from... Questions are not answers. Judge Clay and Judge Merritt up there, I've learned some things. Usually it's not to talk too much. Even if we lose on the exigent circumstances, you really don't have to reach exigent circumstances in this case. You can decide it on consent. And as to Mr. Evans, he has no remedy at all. He never made a confession, so there was no evidence as a result of his arrest. The seizure of the gun and the incriminating clothing, that was a result of the consent. He really has no remedy. It's certainly not a remedy for dismissal because there's plenty of other evidence. Those cases you mentioned, I don't remember them, but you're saying those are cases where you have an illegal entry and then get consent and the consent breaks the link? Yes, Your Honor. I saw it in my brief. It's U.S. v. California on the Sixth Circuit. Okay, so what happened there? Just while I'm asking the court, there was an illegal entry. Basically, they did a search, then they did a sweep, even though they didn't think other people, there was no reason to believe other people were in the house. So that was an illegal search because of that. Then there was a consent after that alleged, or that found to be a legal sweep, and the court in Calhoun applied the independent source doctrine, found that even though there was an illegal entry, the consent provided an independent source for the search. And we have that exactly here, and that's out of the Murray case out of the Supreme Court. So I'm not conceding that we should lose on agent circumstances. I think the totality of the circumstances here, when you look at it, they arrive on the scene, they have a lady telling them, please get my baby out. And the lady is telling them, I know Ms. Dunn and Ms. Johnson were out there. Was it please get my baby out or get my baby out before you do something? No, it was please get my baby out. I don't know where they're getting that they told her, we're going to go in, and then she says, please get my baby out. She says, please get my baby out. They never tell her that they're going in. If you read Officer Bartlett's transcript carefully, he says he arrived on the scene. She told him, ask where are Mr. Dunn and Ms. Jones, which he's entitled to do. She says they're up in an apartment. He says, do they have any guns? That's when they start talking. He tells her, she tells Officer Bartlett, I believe they do have guns up there. She also tells Officer Bartlett that I know these people, I think they've been robbing motels with guns. Please get my baby out. Please get my baby out. And that's what he does, or that's what he responds to. The first agency is when they arrive on the scene and they unexpectedly encounter these suspects by the getaway car. Of course, they see another getaway car in the parking lot. The next agency is when the lady, Ms. Lakendra Thompson, says, please get my baby out. I'm concerned. And they don't know who she is. They just know she's concerned because there's a gun there because of these people. The next agency is when they go up and they knock on the door and they hear the shuffling and what appears to them to be a barricading situation. Then the next agency, they hear a voice saying, don't open the door. Then they hear more shuffling and that's when the officer actually goes in. So I would submit first we should want to wait on the exigent circumstances, but the court does not even need to reach that in this case because you can decide it on a consent basis. I'm not inviting any other questions, but I guess I am inviting any further questions, Your Honor, if I have none. Caroline J. Ardman. Thank you, Your Honor. Thank you. You're a bummer. Your Honor, counsel will submit. All right. I just want to touch on one of the exigencies that Mr. Ardman brought up and that was the scratching on the floor and the noises heard in relation to that and the officers believe that this could be a barricade situation. What we know from the testimony of the officer, after he testified that we heard scratching on the floor, was simply that the floor was actually carpeted and that no furniture was actually moved. So what was the noise that they heard? I think that the fact that they thought it could have been a barricade situation because of some scratching on the floor, if the district court relied upon that as a basis, I would submit that that is clearly erroneous. That holding, that there was any kind of noise. Why does that be incorrect? I mean, you're saying you would lose had there actually been furniture moved. Pardon me? You're saying you would lose if there actually had been furniture moved. I thought the way this worked was probabilities, not what... That's a little bit like saying, well, we thought there were drugs in the apartment, then we came in, there were drugs in the apartment. So we surely had probable cause. I thought the point was you examine all these probabilities before the entry. And I would submit that when the officer testified that one of the basis that he relied upon was the scratching on the floor... You're just saying he lied. I'm saying he lied. Okay, so we have a district court judge that had a chance to listen to this officer's testimony and what conclusion did the district court judge draw? I believe he credited that testimony. But what I'm telling you, what I'm asking your honors to do is to find that simple holding about the scratches on the floor and the noise and their belief that it was a barricade situation to be clearly erroneous because there's no way that he could have heard scratching on the floor because no furniture was moved. There's no way to hear scratching on the floor when it's not a wood floor but a carpeted floor. I just find that that simple holding is... Why couldn't you have heard scratching? I mean, the mistake was to think it was scratching of furniture on the floor. But you could have heard scratching. You're not saying the apartment was scratch-proof that people couldn't make scratching noises. I don't know what would make a scratching noise but I think that the inference from the testimony was that he heard furniture being moved around but in fact there was no furniture. What else is going to make that noise? I'm not really sure. And that's why I think that that holding is clearly erroneous. That's the only thing I wanted to bring up on Ray Baldwin and I thank you, Your Honor. Thank you. And the case is submitted. Thank you.